IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SKILLSURVEY, INC.,                          :
               Plaintiff,          :
    v.                                      :          CIVIL ACTION
                                :          NO. 15-1766
CHECKSTER LLC,                              :
               Defendant.         :

**Jones, II      J.**                                                    **March 31, 2016**

**<u>MEMORANDUM</u>**

      Pending before the Court is Defendant's Motion to Dismiss this suit on the basis that

Plaintiff's patent infringement claims fail as a matter of law because the asserted patent, United

States Patent No. 8,894,416 (the "'416 Patent") entitled "SYSTEM AND METHOD FOR

EVALUATING JOB CANDIDATES" is invalid under 35 U.S.C. § 101 for lack of patent-

eligible subject matter. For the foregoing reasons, this Court agrees. This matter is dismissed.

    **I.**      **Standard of Review**

          **a.**  **Motion to Dismiss**

      In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "accept all factual

allegations as true, construe the complaint in the light most favorable to the plaintiff, and

determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled

to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation

and citation omitted). After the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 555 (2007), "[t]hreadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A

claim has factual plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678

(citing *Twombly*, 550 U.S. at 556). This standard, which applies to all civil cases, "asks for more

than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678; *accord Fowler v.*

*UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) ("[A]ll civil complaints must contain more

than an unadorned, the-defendant-unlawfully-harmed-me accusation.") (internal quotation marks

omitted).

### b.  Patent Eligibility

Under § 101, the scope of patentable subject matter includes "any new and useful

process, machine, manufacture or composition of matter, or any new and useful improvement

thereof, may obtain a patent therefor, subject to the conditions of this title." 35 U.S.C. § 101.

Eligible subject matter does not include "laws of nature, natural phenomena, and abstract ideas."

*Diamond v. Diehr*, 450 U.S. 175, 185 (1981). These exclusions should not be construed too

broadly however, because all inventions "at some level embody, use, reflect, rest upon, or apply

laws of nature, natural phenomena, or abstract ideas." *Mayo Collaborative Services v.*

*Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012) ("*Mayo*"). Thus, courts are tasked with

differentiating between patents that attempt to monopolize the "building blocks" of human

ingenuity and those that transform the building blocks into something more. *Alice Corp. Pty. v.*

*CLS Bank Int'l*, 134 S.Ct. 2347, 2354 (2014) ("*Alice*") (citing *Mayo*, 132 S.Ct. at 1303). Validity

under § 101 is a question of law. *Fort Properties, Inc. v. Am. Master Lease LLC*, 671 F.3d 1317,

1320 (Fed. Cir. 2012).

In *Mayo*, the Supreme Court developed a two-step "framework for distinguishing patents

that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-

eligible applications of those concepts." *Alice*, 134 S.Ct. at 2355. First, the Court must determine

if the patent is based on one of the patent-ineligible concepts (e.g. laws of nature, natural phenomena or an abstract idea). *Id.* (citing *Mayo* , 132 S. Ct. at 1296-97). If so, second, the Court must consider "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.* (quoting *Mayo*, 132 S. Ct. at 1297-98). This second step is a "search for an 'inventive concept'- *i.e.*, an element or combination of elements that is 'sufficient to ensure that a patent in practice amounts to significantly more than a patent upon the [ineligible] concept itself.'" *Alice*, 134 S.Ct. at 2355 (quoting *Mayo*, 132 S.Ct. at 1294).

It is appropriate to address a § 101 challenge at the pleading stage. *See, e.g.*, *OIP Technologies, Inc. v. Amazon.com Inc.*, 2012 WL 3985118, at *5 (N.D. Ca. 2012) ("*OIP*") (collecting cases); *see also Bancorp Servs., LLC v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("*Bancorp*") ("[C]laim construction is not an inviolable prerequisite to a validity determination under § 101."). Where, as here, "the basic character of the claimed subject matter is readily ascertainable from the face of the patent, the Court finds that it may determine patentability at the motion to dismiss stage." *Internet Patents Corp. v. Gen. Auto. Ins. Servs., Inc.*, 29 F. Supp. 3d 1264, 1268 (N.D. Cal. 2013) ("*Internet Patents*") *aff'd sub nom. Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343 (Fed. Cir. 2015) ("*Internet Patents*"); *see id.* (Mayer, J. concurring) ("Addressing 35 U.S.C. § 101 at the outset not only conserves scarce judicial resources and spares litigants the staggering costs associated with discovery and protracted claim construction litigation, it also works to stem the tide of vexatious suits brought by the owners of vague and overbroad business method patents.").

## II.    Background

When deciding a motion to dismiss under 12(b)(6), the "court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainants claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). "[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Industries, Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

### a.   The '416 Patent

SkillSurvey, Inc. ("Plaintiff") filed an Amended Complaint against Checkster LLC[1] ("Defendant") for violating their United States Patent No. 8,894,416 ("'416 Patent") under 35 U.S.C. § 1 *et seq.* (Dkt No. 8 [hereinafter AC] ¶ 1.) The '416 Patent "relates to a human resource management system, and more particularly to a system for collecting and analyzing information from references identified by job candidates." '416 Patent cols. 1-2.

This patent comprises:

> A system for collecting and analyzing survey data from reference providers identified by a job candidate for use by an employer...The system includes a candidate database that stores survey data which are provided by the reference providers. A collection module running in the system sends an electronic communication to the reference providers requesting them to complete the survey questions and electronically receives the survey data. The electronic communication preferably contains a URL link that takes the reference provider to a dynamically generated webpage through which the survey data are entered.

---

[1] Defendant notes in its filings that Checkster LLC has been dissolved. (MTD at 2 n. 1.) According to Defendant, the proper entity for suit is Checkster, Inc. (MTD at 2 n. 1.) Plaintiff argues that "Checkster's dissolution papers were not filed with the California Secretary of State's office until August 4, 2015, days after being served with SkillSurvey's FAC. Thus, SkillSurvey's naming of Checkster LLC as a defendant was indeed proper..." (Resp. at 7 n. 6.) Given that the pending Motion does not depend on resolution of this issue, the Court will not endeavor to resolve it at this time.

An analysis module running in the system combines the received survey data from the reference providers and generates a candidate report. In one aspect, the candidate report is a confidential report which excludes identification of any rating or comments by any reference providers. In another aspect, the system also generates customized interview probe questions for use after the hiring, based on the weak area that have been identified from the completed surveys in order to assist the hiring manager to bring the new hires up to speed quickly and effectively.

'416 Patent cols. 1-2. The "Background of the Invention" section explains that the '416 Patent differs from "traditional reference checking methods such as telephone interviews," because the '416 Patent process is less costly, is done earlier in the hiring process, is "substantially automated," is anonymized, and provides "guidance for the hiring manager to further explore areas of weakness in the candidate during the hiring process." '416 Patent cols. 1-2.

In granting the '416 Patent, the United States Patent and Trademark Office stated that the examiner allowed the patent because it was an "improved computer system programmed for reference checking." (Not. Of Allowance and Fee(s) Due, Dkt No. 18, Ex. 4 [hereinafter Not.] at 2.) The Notice further noted that the method/system was patented because it provided position specific surveys, calculated statistical scores in competency skill groups, kept the data confidential, and created statistical benchmarking scores. (Not. at 2.) The Notice specifically mentioned that the application was also allowed "for the order/steps in which these limitations take place," including that "all the limitations take place before the interview is conducted." (Not. at 3.)

The '416 Patent asserts twenty claims constituting method and system claims. '416 Patent cols. 10-16. Method claims are within the statutory class of processes. 35 U.S.C. § 100(b). Claims 1 and 11 are independent claims. Claim 1 explains a computer-implemented method that sets up initial job specific survey questions for an applicant's references, connects with the references, collects the survey data provided by the references, anonymizes the survey data,

analyzes the survey data, and generates reports for the hiring manager based on a comparison of the candidate's survey results against other candidates, the hiring company's own employees, or other relevant industry databases, including generating statistical scores for the applicant in competency skill groups, in that order and prior to the perspective applicant's interview. '416 Patent cols. 10-12.

Claim 11 explains how generic computer technology would implement Claim 1, including a "specialize [*sic*] computer machine" with "a non-transient memory having at least one region for storing particular computer executable program code; and at least one processor for executing the particular program code stored in the memory..." '416 Patent col. 13. The ability to store information and to execute code are generic computer components. Beyond these commonplace, generic computer requirements, Claim 11 exactly mimics Claim 1. *See Alice*, 134 S. Ct. at 2360 ("Put another way, the system claims are no different from the method claims in substance. The method claims recite the abstract idea implement on a generic computer; the system claims recite a handful of generic computer components con-figured to implement the same idea."). These generic computer and Internet components do not provide a meaningful limitation "beyond generally linking the use of the [method] to a particular technological environment." *Accenture Global Services, GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013) (internal citations omitted). Thus, Claims 1 and 11 are inextricably linked. *Id.* ("[S]ystem claims that closely track method claims and are grounded by the same meaningful limitations will generally rise and fall together.").

The remaining claims are dependent on either Claim 1 or 11. Claims 2-10 are dependent on Claim 1. Clams 12-20 are dependent on Claim 11. Claims 2-5, 7, 12-15, and 17 explain how the method/system will create an average statistical score for each applicant based on the

applicant's references' survey answers and will benchmark the average statistical score against company-wide and industry-wide data. '416 Patent cols. 12, 15. Claims 8 and 18 explain that the computer-implemented method/system will identify whether the job being applied for is a management level position. '416 Patent col. 12. Claims 6 and 16 provide that the computer-implemented method/system will identify, validate, and store the email addresses of the applicant-identified references, and will email the references with personalized requests to fill out the surveys. '416 Patent col. 12. Claims 9-10 and 19-20 explain that the computer-implemented method will provide unique identifiers for each of the references and will send the references URL links encoded with the references' unique identifiers. '416 Patent cols. 12-13. The limitations in the dependent claims are slight variations on the limitations contained in the independent claims. They do not provide limitations beyond those already encapsulated in the two independent claims.

The Court will analyze Claim 1 as representative of all of the claims. *C.f. Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed.Cir. 2014) ("*Content Extraction*") (holding that where all of the claims are directed to the same abstract idea, "addressing each of the asserted patents...[is] unnecessary"); *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1007 (Fed. Cir. 2014) ("*Planet Bingo*") (affirming district court's finding that "[t]he system claims recite the same basic process as the method claims, and the dependent claims recite only slight variations on the independent claims"); *see also Intellectual Ventures I LLC v. Erie Indem. Co.*, 2015 WL 5686643, at *21 (W.D. Pa. 2015) ("*Intellectual Ventures*") (collecting cases); *Smart Sys. Innovations, LLC v. Chicago Transit Authority*, 2015 WL 4184486, at *4 (N.D. Ill. 2015) ("*Smart Sys.*") ("[W]here a patent's claims

are substantially similar and linked to the same abstract idea, courts may look to representative claims.") (internal quotations omitted).

### b. Procedural History

Plaintiff markets the '416 Patent as Pre-Hire 360®. (AC ¶ 8.) Defendant makes and sells automated reference checking systems and services, provided through its website. (AC ¶¶ 5, 9.) Plaintiff alleges that Defendant has and continues to knowingly use Plaintiff's '416 Patent without authorization. (AC ¶¶ 9-26.)

Defendant filed a Motion to Dismiss asserting that the case should be dismissed because the '416 Patent is invalid under § 101. (Dkt No. 16 [hereinafter MTD] at 10-19.) Plaintiff responded that the ordered combination of the claimed steps constituted an inventive concept. (Dkt No. 18 [Resp.] at 8-9, 15-21.) Defendant replied arguing that no inventive concept was present. (Dkt No. 26 [Rep.] at 3-6, 9 n. 3.)

## III. Discussion

### a. Burden of Proof

Under 35 U.S.C § 282, patents are presumed valid and the burden of proof for establishing invalidity rests on the party asserting such invalidity. Patent invalidity defenses must be proved by clear and convincing evidence due to the presumption of validity. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2244-53 (2011).

Lower courts have disputed the applicability of the presumption of validity in cases that challenge validity under § 101. In a recent concurrence to a Federal Circuit opinion, Judge Haldane Robert Mayer stated that no presumption of validity should attach when assessing § 101 matters because: (1) the United States Patent and Trademark Office "for many years applied an insufficiently rigorous subject matter eligibility standard," and (2) the recent Supreme Court cases that address § 101 have not mentioned or applied the presumption of eligibility.

*Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 720-21 (Fed. Cir. 2014) (Mayer, J. concurring) ("*Ultramercial*"). Without authoritative law binding the lower courts, various courts have adopted Judge Mayer's approach and have not afforded a patent challenged under § 101 the presumption of validity. *See, e.g.*, *Wireless Media Innovations, LLC v. Maher Terminals, LLC*, 100 F.Supp.3d 405, 411 (D.N.J. 2015) ("[T]o apply a 'clear and convincing' standard as to subject matter eligibility at the motion to dismiss stage, the Court would effectively create a near impossible threshold for a defendant to clear when assessing a patent's subject matter under the test articulated in *Alice*."); *Modern Telecom Sys. LLC v. Earthlink Inc.*, 2015 WL 1239992, at *7 (C.D. Cal. 2015); *OpenTV, Inc. v. Apple, Inc.*, 2015 WL 1535328, at *3 (N.D. Cal. 2015) ("*OpenTV*"); *Datatrak Internat'l, Inc. v. Medidata Solutions, Inc.*, 2015 WL 6870109, at * 2 (N.D. Ohio 2015).

The prevailing argument on the other side of the split is that the Supreme Court's failure to differentiate or distinguish the analysis under § 101 from analyses under §§ 102 and 103 (such sections indisputably covered by the presumption) implies that the presumption also applies to § 101. *See, e.g.*, *Listingbrook, LLC v. Market Leader, Inc.*, 2015 WL 7110940, at * 5 (M.D. N.C. 2015) (holding that "[a]bsent a controlling opinion from the Supreme Court or Federal Circuit holding that the presumption of validity and clear and convincing standard of proof do not extend to § 101 challenges, the Court will apply both the presumption and the standard of proof in this case"); *see also Exergen Corporation v. Brooklands Inc.*, 2015 WL 5096464, at *2 (D. Mass. 2015); *Tenon & Groove, LLC v. Plusgrade S.E.C.*, 2015 WL 82531, at *3 (D. Del. 2015); *Ameritox, Ltd. v. Millennium Health, LLC*, 88 F.Supp.3d 885, 901-02 (W.D. Wis. 2015); *Tranxition, Inc. v. Lenovo (U.S.) Inc.*, 2015 WL 4203469, at *4-5 (D. Oregon 2015); *Affinity Labs of Texas, LLC v. Amazon.com, Inc.*, 2015 WL 3757497, at *5 n. 4 (W.D. Tex. 2015); *Tuxis*

*Technologies, LLC v. Amazon.com, Inc.*, 2014 WL 4382446, at * 1 (D. Del. 2014) ("*Tuxis*");

*Intellectual Ventures I LLC v. Manufacturers and Traders Trust Co.*, 76 F.Supp.3d 536, 540 (D.

Del. 2014) ("*Intellectual Ventures*").

Despite finding the counter-argument persuasive, the Court follows the weight of

authority and holds that patent invalidity defenses under § 101 must be proved by clear and

convincing evidence due to the presumption of validity.[2]

### b.  Lack of Patentable Subject Matter

#### i.  The '416 Patent is drawn to an abstract idea.

The first step in determining patent-eligibility is whether the patent is based on a patent

ineligible concept. *Alice*, 134 S.Ct. at 2355. Patent ineligible concepts include laws of nature,

natural phenomena and abstract ideas. *Id.* Defendant asserts that the '416 Patent's purpose

(conducting job applicant reference checks) is a mental process that is a "time-honored,

'longstanding commercial practice' and 'method of organizing human activity.'" (MTD at 12.)

Although Plaintiff states that they do not concede this point, they bring forth no argument to

dispute Defendant's claim. (Resp. at 12.) The Court finds that the '416 Patent is drawn to an

abstract idea.

The '416 Patent has a very simple premise: anonymously surveying references and

compiling the survey data before interviewing applicants will help companies only interview the

best applicants. The '416 Patent is "trying to achieve," *Enfish, LLC v. Microsoft Corp.*, 56

---

[2] Plaintiff makes numerous arguments in its briefings regarding the fact that the '416 Patent was issued after *Alice*. Plaintiff explains that finding that the post-*Alice* issued'416 Patent was directed to an abstract idea would be "unprecedented." (Resp. at  2.) The fact that the '416 Patent was issued post-*Alice* neither protects it from an invalidity challenge nor causes the burden of proof to be heightened. First, if it were determinative whether the patent was filed pre- or post- *Alice*, "any patent issued post-*Alice* would be inoculated from invalidity under Section 101. That is not the case." *Collarity, Inc. v. Google Inc.*, 2015 WL 7597413, at *11 (D. Del. 2015). Second, the standard of review is clear and convincing evidence. The standard is not clear and convincing for pre-*Alice* patents, but clearer and more convincing for post-*Alice* patents. The fact that the '416 Patent was issued after *Alice* does not affect the Court's analysis in any way.

F.Supp.3d 1167, 1173 (C.D. Cal. 2014) ("*Enfish*"), the abstract idea of reference checking job applicants. The idea at the "heart" of the patent, *Ultramercial*, 772 F.3d at 714, is the abstract idea of anonymously surveying prior employers within the context of job applications.

Abstract ideas include methods or processes that can be done by human thought alone. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011). "[M]ethods which can be performed mentally or which are the equivalent of human mental work, are unpatentable abstract ideas - the 'basic tools of scientific and technological work' that are open to all." *Id.* at 1371 (*quoting Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)). An abstract concept rendered through computer-aided processes remains abstract. *Internet Patents*, 790 F.3d at 1347 (collecting cases). Where every aspect of the patented method could be carried out manually, courts tend to find that the method is too abstract to be patentable.

In this case, the claims, alone and in combination, could all be completed by the human mind.[3] A pen and paper version of the claimed method would not be particularly efficient, but it could be completed. The HR representative could improve upon the efficiency of this process by using generic email and word processing programs. The claimed steps can easily "be carried out in existing computers long in use, no new machinery being necessary. And, as noted, they can also be performed without a computer." *Gottschalk*, 409 U.S. at 66 (1972).

---

[3] For example, a human resources ("HR") representative at the hiring company could develop position-specific survey questions. The HR representative could collect references' phone numbers by speaking in person or on the telephone with all applicants. The HR representative could call the applicants' references. During each call, the HR representative could keep the name of the hiring company anonymous. Further, the HR representative could assure the reference that his or her responses would be reported anonymously. Using pen and paper, the HR representative could collect responses to the survey questions, physically removing any identifying information. Pursuant, to the '416 Patent method, the HR representative would need to create average statistical scores for each applicant. These scores are simply the average of the collected numerical responses. These types of mathematical calculations could easily be performed by hand. Through the use of a hand-drawn table, the HR representative could then compare the average score for each applicant against other applicants and other employees of the company. The HR representative could report the top job applicants for next round interviews to another member of HR without ever revealing the identity of the references.

Simply put, storing and analyzing responses from references and making hiring recommendations on the basis of the references' answers is a well-known method of organizing human activity. At its "heart," these claims represent the abstract idea of soliciting, storing, and analyzing of information provided by references in such a way as to hedge the risk of receiving incomplete or inaccurate responses from references during the hiring process. *See, e.g.*, *Alice*, 134 S.Ct. at 2351-52 (holding patent to be abstract where it was directed to abstract concept of intermediated settlement); *Bilski v. Kappos*, 561 U.S. 593, 611 (2010) (same, patent direct to abstract idea of "risk hedging"); *Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 992 (Fed. Cir. 2014) ("[T]he idea of collecting information in classified form, then separating and transmitting that information according to its classification is an abstract idea."); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1397 (Fed. Cir. 2015) (same, patent directed to budgeting) ("*Intellectual Ventures*"); *Content Extraction*, 776 F.3d at 1347 (same, patent directed to collecting data, recognizing certain collected data, and storing recognized data); *Planet Bingo*, 576 F. App'x at 1007 (same, patent directed to solving a tampering problem and minimizing security risks during bingo ticket purchases); *Accenture*, 728 F.3d at 1344 (same, patent directed toward "generating tasks [based on] rules...to be completed upon the occurrence of an event."); *Intellectual Ventures*, 2015 WL 5686643, at \*24 (same, patent for "gathering, storing, and acting on data based on predetermined rules"); *In re TLI Communications LLC Patent Litig.*, 87 F.Supp.3d 773, 787 (E.D. Va. 2015) ("[T]he taking, organizing, classifying, and storing of photographs...is a common practice..."). Of particular note, in *Walker Digital,* the court found that the method/system claims related to a computerized, anonymized headhunting or matchmaking service was directed to an abstract idea as all of the patent's "steps can and routinely are performed, by, for example, human job headhunters."

*Walker Digital, LLC v. Google, Inc.*, 66 F.Supp.3d 501, 509-10 (D. Del. 2014) ("*Walker Digital*"). The '416 Patent is directed to an abstract idea.

### ii. The '416 Patent does not contain an inventive concept.

The presence of an abstract idea does not, in and of itself, render an idea patent ineligible. *Alice*, 134 S. Ct. at 2354. An idea is not patentable, however, "unless the process has additional features that provide assurance that the process is more than a drafting effort designed to monopolize" the process. *Mayo*, 132 S. Ct. at 1297. Patents will be held to be valid where an additional element, or an inventive concept, transforms the abstract idea into something more. *Id.* at 2355. This requires evaluating the elements individually and as an ordered combination. *Id.* An inventive concept will not be found where the activity is "well-understood, routine, or conventional." *Mayo*, 132 S.Ct. at 1299.

In this case, Plaintiff argues that the '416 Patent is an inventive concept because, first, the method/system uses "specially configured 'independent' computer technology" to secure confidentiality, while being "faster and more efficient" than traditional methods. (Resp. at 15-21.) Second, the method/system reflects a "new combination of steps" performed before the applicant's interview, thereby achieving "a large difference in effectiveness." (Resp. at 15-21.)

However, argues Plaintiff, the method is not inventive "just in terms of automation and processing speed or efficiency but [rather in terms of] overall utility, accuracy, quality of hire and long-term productivity, retention and cost savings." (Resp. at 26 (internal citations omitted.)) Plaintiff's contention that the '416 Patent improves the "accuracy, quality of hire and long-term productivity" relates to Plaintiff's assertion that the method asks better questions and gets better answers. Underlying these assertions are the same considerations listed above: efficiency and anonymity. First, Plaintiff has, obviously, not patented the questions themselves, nor the research underlying the questions. Rather, Plaintiff's alleged improvement on the reference questions

13

relates to the alleged efficiency of the method through computerization. The questions are improved because they ask for numerical scoring, and thus can be quickly averaged and benchmarked against other applicants. Second, Plaintiff's benchmark of "long-term productivity" is related to Plaintiff's assertion that its method's promise of anonymity ensures more frank answers from references. When references are honest about the qualifications of a former employee, prospective employers are obviously better able to predict the potential productivity of applicants. Plaintiff's arguments about inventiveness boil down to the efficiency and the anonymization caused by the computerization, and the novelty of both the ordered collection of the steps and the timing of the process. The Court finds none of these arguments persuasive.

### 1. Use of generic computer technology does not render this otherwise abstract idea inventive.

The computer and Internet technologies described in the patent are generic. The specified computer is "any computer such as a WINDOWS-based or UNIX-based personal computer, server, workstation or a mainframe, or a combination thereof." '416 Patent col. 3. The computer is linked to the Internet through "a LAN, WAN, or fiber optic, wireless or cable link which receives information from and send information to other computers." '416 Patent col. 3. The webpages for the method and system "are generated by a conventional database web page generating engine." '416 Patent col. 4.

Requiring the use of generic computer technology does not create an inventive concept. *Alice*, 134 S.Ct. at 2358. In *Alice*, the patent claims at issue "facilitate[d] the exchange of financial obligations between two parties by using a computer system as a third-party intermediary." *Id.* at 2352. After finding that the patent was based on an abstract idea, the Supreme Court found that the implementation of a computer did not transform it into patent-

eligible idea. *Id.* at 2358. Claims that provide an abstract concept and "apply it with a computer" should be rejected. *Id.* Further, a dependent claim cannot add an inventive concept where the claim simply sits "the ineligible concept in a particular technological environment." *Internet Patents*, 790 F.3d at 1349 (citing *Bancorp*, 687 F.3d at 1273).

In this case, the addition of computerization to the abstract concept of reference checking does not add an inventive concept. *See, e.g.*, *Mortgage Grader, Inc. v. Costco Wholesale Corp.*, 89 F.Supp.3d 1055 (C.D. Cal. 2015) (finding that the method was not patentable because it could be accomplished by a "human broker taking the information by hand and calculating the credit grading by hand or by looking at a table"). It is inarguable that using computer technology would necessarily make the claimed method more efficient. However, adding efficiency to a long-standing process through computerization also does not render an abstract idea patentable. "[R]elying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible." *OIP*, 788 F.3d at 1363; *see also East Coast Sheet Metal Fabricating Corp. v. Autodesk, Inc.*, 2015 WL 226084, at *7 (D.N.H. 2015) *amended in part*, 2015 WL 925614 (D.N.H. 2015) ("[W]hen the alleged innovation involves the use of a generic computer to do what computers typically do, *i.e.*, speed up a process by eliminating the need for human activity, that innovation is not an invention eligible protection.").

However, there is an exception to the general computerization case law. "[W]hen claims provide a specific computing solution for a computing problem, those claims should generally be patentable..." *Cal. Institute of Tech. v. Hughes Comm. Inc.*, 59 F.Supp.3d 974, 993 (C.D. Cal. 2014); *see also DDR Holdings, LLC v. Hotels.com, LP*, 773 F.3d 1245, 1256-57 (Fed. Cir. 2015) ("[T]hese claims stand apart because they do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the

Internet. Instead, the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks."); *DataTern, Inc. v. Microstrategy, Inc.*, 2015 WL 5190715, at *8 (D. Mass. 2015) (finding that a computer-oriented technology could be patentable where it was "directed at solving a problem that specifically arises in the realm of computing").

In this case, the problem being solved by the use of computer technology does not solve a specific computing problem. The issues associated with reference checking (e.g., untruthful or incomplete answers from references, difficulty comparing applicants), remain from an increasingly distant "pre-Internet world." The '416 Patent amounts to nothing more than the steps for checking references with the added premise of technology. Because the concept is equivalent to the "apply it with a computer" language rejected in *Alice*, it cannot be said to be an inventive concept. 134 S. Ct. at 2358.

None of the limitations adds inventiveness to this abstract idea. Taking the average of a collection of numerically scored answers and comparing them to other average scores constitutes basic math that any elementary school educated human or generically programmed computer can accomplish. *See, e.g. Enfish*, 56 F. Supp. 3d at 1176 ("Tables continue to be elementary tools used by everyone from school children to scientists and programmers."); *see also Intellectual Ventures*, 76 F.Supp.3d at 542 ("[T]he use of a computer in an otherwise patent-ineligible process for no more than its most basic function – making calculations or computations-fails to circumvent the prohibition against patenting abstract ideas and mental processes."). Taking an applicant's average score and benchmarking it against other applicants and industry statistics is nothing more than a simple visual comparison with the added efficiency of computer technology. *See, e.g.*, *Walker Digital*, 66 F. Supp. 3d at 515 (holding that dependent claims that provided

16

comparisons of persons did not add inventive concept). "The assigning of unique identification codes, providing access to URLs, and generating URLs describe routine, conventional activity of how computers communicate with each other via the Internet." *Essociate, Inc. v. Clickbooth.com LLC*, 2015 WL 1428919, at *8 (C.D. Cal. 2015). "That a computer receives and sends the information over a network - with no further specification – is not even arguably inventive." *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014). "[T]he use of the Internet is not sufficient to save otherwise abstract claims for ineligibility under § 101." *Ultramercial, Inc.*, 772 F.3d at 716.

Most importantly, using generic computer technology to address a pre-existing need for confidentiality in a long-standing practice does not render an abstract idea into an inventive concept. *See Walker Digital,* 66 F. Supp. 3d at 511; *OpenTV*, 2015 WL 1535328, at *5. In contrast, where computer technology is being used to address a need for confidentiality due to deficiencies related to generic computer technology, the addition of confidentiality may render an abstract idea into an inventive concept. *See, e.g.*, *Mobile-Plan-It, LLC v. Facebook, Inc.*, 2015 WL 1801425, at *4 (N.D. Cal. 2015) ("*Mobile-Plan-It*").

In this case, Plaintiff explains, the addition of confidentiality "permits more candid feedback from references and provides a report to the employer that is more useful than information gained from traditional, well-known, routine, or conventional methods of reference checking." (Resp. at 20.) The addition of confidentiality through generic computing technology is not addressing a problem derived from that self-same use of generic computing technology. As the court in *Mobile-Plan-It* explained, differentiating itself from *Walker Digital*, in *Walker Digital*, "the problem being addressed plainly existed prior to and apart from any technological solution offered." *Mobile-Plan-It*, 2015 WL 1801425, at * 8. The same is true here. The patent

addresses "the pervasive problem of making the right talent decision." (Resp. at 21.) It is an obvious, and longstanding problem that when asked to speak on the record, prior employers are unlikely to be fully forthright about former employees. Assurances of confidentiality assuage these fears. This is not a problem that computer technology caused, like in *Mobile-Plan-It*. This is a problem that has long existed but that computer technology can fix more efficiently, like in *Walker Digital*.

Any other argument about how confidentiality improves the process sounds in another version of the argument that the addition of computer technology expedites or simplifies the process. As previously addressed, such arguments are insufficient to create an inventive concept.

All these steps together, comprising anonymously collecting survey data, summarizing survey data, and presenting survey data, are ways to implement the abstract idea of reference-checking with generic computer technology. *See Intellectual Ventures*, 76 F.Supp.3d at 545 ("The steps of storing data from a user, listing data, and presenting summary data (configured in a table), however, are ways to implement the abstract idea with routine and conventional computer activity.") (quoting *Ultramercial*, 772 F.3d at 716) (internal citations omitted)). In conclusion, the generic computer technology here only makes the abstract idea more efficient, not more inventive.

### 2. The novelty of the idea does not render it an innovative concept.

Plaintiff argues that the claimed invention "transform[s] what was traditionally an afterthought and the least relevant step in the hiring process – reference-checking into one of the earliest, threshold, and most important steps that takes places before the interview...and combining it for the first time in history with...over a decade of behavioral research and science."

(Resp. at 9.) Thus, Plaintiff is arguing that the novelty of the combination of steps and the timing of those steps renders the abstract patentable. The Court finds neither argument persuasive.

First, novelty alone does not add inventiveness. *See Ultramercial*, 772 F.3d at 714-15; *see also Diamond*, 450 U.S. at 189 (stating that "[t]he 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter"). An inventive concept is not present simply because a claim or patent is not well-known or not routine. *Ultramercial*, 772 F.3d at 715. "It matters not that, even if the individual elements are not individually innovative, nobody before used them all together in [a] new setting...." *Smart Sys.,* 2015 WL 4184486, at *6 (internal citations omitted).

A novel combination of steps cannot alone render an abstract idea patentable. In certain circumstances, "a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made." *Diamond*, 450 U.S. 175, at 188. However, the only context in which courts tend to find that a novel combination is patentable, even though its component parts are not, is in the context of manufacturing. In *Diamond*, for example, the ordered combination of the claimed steps was literally greater than the sum of their parts. It was "part of a transformative, manufacturing process." *Smart Sys.*, 2015 WL 4184486, at *6. Here, the novel ordered combination is simply a "grouping of conventional steps and extant technology." *Id.* (quoting *Ultramercial*, 772 F.3d at 716-17 (internal citations omitted)). Further, even assuming that this reference checking process is wholly novel in the field of human resources, it is not inventive for that fact alone. *See, e.g., Intellectual Ventures I LLC v. Capital One Bank*, 792 F.3d 1363, 1366

(Fed. Cir. 2015) ("An abstract idea does not become nonabstract by limiting the invention to a particular field of use...").

Second, Plaintiff repeatedly asserts that the ordered combination is inventive because it takes place *before* the job applicant is interviewed. (Resp. at *passim*.) This argument is unavailing. An abstract idea does not become inventive due to its timing in a greater process. Limiting the abstract idea to pre-interview timing cannot render it inventive. "[L]imiting an abstract idea to one field of use or adding token postsolution components did not make the concept patentable." *Bilski*, 561 U.S. at 612 (citing *Parker v. Flook*, 437 U.S. 584 (1978) ("*Flook*")). For example, in *Flook*, the Supreme Court held that an algorithm could not be rendered patentable simply by adding a final step after application of the algorithm. *Flook*, 437 U.S. at 590. By way of example, the Supreme Court explained that:

> the Pythagorean theorem would not have been patentable, or partially patentable, because a patent application contained a final step indicating that the formula, when solved, could be usefully applied to existing surveying techniques. The concept of patentable subject matter under § 101 is not "like a nose of wax which may be turned and twisted in any direction...."

*Flook*, 437 U.S. at 590-91 (quoting *White v. Dunbar*, 119 U.S. 47, 51 (1886)). Similarly, in this case, an abstract idea of reference checking is not rendered patentable because of the addition of a final step of using the reference checking to make interview decisions.

Consider: a client of Plaintiff's decides, without telling Plaintiff, to use Plaintiff's services to confirm hiring choices after all the interviews have been completed (rather than using it to select interviewees). Such client would arguably not be using Plaintiff's patented idea, even though the client would be using Plaintiff's software, web interface, technology and survey questions. Consider: what if Defendant used Plaintiff's identical software, web interface, technology, and survey questions (trademark and copyright issues aside), but encouraged its customers to use the services to confirm hiring choices after interviews? Arguably, Defendant

would not be infringing on Plaintiff's patent. Yet, if Defendant engaged in the same behavior but encouraged the use of the product before the interview, there would be infringement. The idea that an invention could see-saw from patented to unpatented simply on the basis of the timing of the client's use of the invention does not comport with patent law.

Furthermore, enforcing this patent would necessarily curb innovation in reference checking. A hypothetical will prove instructive. *See, e.g.*, *Tuxis*, 2014 WL 4382446, at *5 (providing a hypothetical to demonstrate preemption). Company XYZ decides to use a free, generic online survey tool to survey references. Company XYZ does not provide an opportunity for the reference to provide identifying information, and ensures that all information be kept confidential. Company XYZ then collects the survey answers, and compares candidates to each other on the candidates' core competencies. Company XYZ does this all before interviewing the candidate.

Would Plaintiff have a cognizable claim against Company XYZ for violation of their patent? Most likely, yes. Yet, what if Company XYZ could do a substantially better job inventing position-specific survey questions? What if Company XYZ's software innovated how the survey responses were integrated into other parts of Company XYZ's human resources internal databases and systems? Such innovation would be preempted by this patent. Moreover, this hypothetical is simply about a company's internal system, it does not even address the innovations outright competitors to Plaintiff (like Defendant) could create. "To allow the claim to survive would disproportionately risk preempting a building block of human interaction, retarding rather than promoting progress, contrary to the very purpose patents are granted." *Walker Digital,* 66 F.Supp.3d, at 511.

IV.     Conclusion

The '416 Patent patents a time-honored process: reference checking. Plaintiff has arguably improved this process, making it more efficient, soliciting more helpful, data-driven responses, and improving the quality of the recommendations based on reference feedback. The improvements made by Plaintiff, however, are not patentable. Taking this traditional process and computerizing it is not enough. Anonymizing the data is not enough. Encouraging clients to use the method before interviewing applicants is not enough. In light of the foregoing, the claims of the '416 Patent are directed to a patent-ineligible subject matter under 35 U.S.C. § 101. As such, Defendant's Motion to Dismiss is granted. This case is dismissed.


BY THE COURT:

/s/ C. Darnell Jones, II

_____

C. Darnell Jones, II    J.